# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

TAMMY L. STASKIEVITZ,

    *Plaintiff*,

v.                                                            CASE NO. 12-CV-15213

COMMISSIONER OF                           DISTRICT JUDGE ROBERT H. CLELAND
SOCIAL SECURITY,                            MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.   REPORT

    **A.   Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, Disability Insurance

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at:  http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Benefits ("DIB"), and Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 16, 17.)

Plaintiff Tammy Staskievitz was 34 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 11 at 38.) Plaintiff's employment history includes work as an assembler in manufacturing for nine years, a grounds-person for one year, a housekeeper for six years, and a kitchen helper for one year. (Tr. at 227.) Plaintiff filed the instant claims on January 10, 2007, alleging that she became unable to work on January 2, 2007. (Tr. at 186-93, 194-98.)[2] The claims were denied at the initial administrative stages. (Tr. at 53.) In denying Plaintiff's claims, the Commissioner considered disorders of back (discogenic and degenerative) as possible bases for disability. (*Id.*) On February 25, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Kathleen H. Eiler, who considered the application for benefits *de novo*. (Tr. at 15-33, 34-52.) In a decision dated June 30, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 27.) Plaintiff requested a review of this decision on March 28, 2011. (Tr. at 12-14.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on July 24, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 5-9.) On November 27, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is

---

[2]Plaintiff's previously filed claim was denied on August 12, 2009. (Tr. at 67.)

multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making

3

a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

**C.    Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381, *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through March 30, 2010, and that Plaintiff had not engaged in substantial gainful activity since January 2, 2007, the alleged onset date. (Tr. at 20.) At step two, the ALJ found that Plaintiff's degenerative disc disease and status post lumbar laminectomy and fusion were "severe" within the meaning of the second

6

sequential step. (Tr. at 21.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (*Id.*) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. at 25.) The ALJ also found that as of the alleged disability onset date, Plaintiff was 29 years old, which put her in the "younger individual age 18 - 44" category. *See* 20 C.F.R. Part 404, Subpart P, App. 2. At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 21-25.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 26-27.)

### E. Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff underwent two lumbar surgeries, one micro-diskectomy at L4-L5 in May 2005 and a complete fusion at L4-L5 in July 2006. (Tr. at 343, 346-48, 358, 362, 365-66, 515-17.) Plaintiff participated in physical therapy in August 2006. (Tr. at 334-35, 338-41, 541-47.)

On December 4, 2006, David Morris, M.D., of the Center for Neurological Study stated that Plaintiff "presents with a continuing pattern of symptoms involving her left anterior thigh" but that the "MRI study of her lumbar spine looks absolutely unremarkable" and there "does not appear to be any evidence of nerve root impingement serving as the basis of her symptoms." (Tr. at 329.) Dr. Morris was "wondering whether her present symptoms are a product of mechanical etiologies arising from the lateral femoral cutaneous irritation from perhaps the brace that she was using concurrent with her initial fusion procedure." (*Id.*) AN MRI of Plaintiff's pelvis taken on January 9, 2007, showed "[n]o abnormalities identified at either hip." (Tr. at 328, 394.)

Plaintiff sought treatment in the emergency room on February 2, 2007, for low back and gluteal pain after she slid down several steps. (Tr. at 518-19.) It was noted that Plaintiff had 5/5 strength in her quadriceps, hamstrings, and extensor hallucis longus, that she could "straight leg

raise bilaterally," and that she "could toe-stand and toe-walk." (Tr. at 518.) Plaintiff was diagnosed with a lumbosacral contusion and discharged home with pain medication. (Tr. at 519.) An x-ray of the lumbosacral spine taken that day showed "[n]o acute abnormalities[.]" (Tr. at 520.)

A Physical Residual Functional Capacity ("RFC") Assessment was completed on March 8, 2007. (Tr. at 525-32.) The assessment concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, was unlimited in her ability to push or pull, could occasionally climb ladder/rope/scaffolds and could frequently balance and climb stairs or a ramp. (Tr. at 526-27.) There were no manipulative, visual, communicative, or environmental limitations established. (Tr. at 528-29.) The assessment found Plaintiff's alleged symptoms only partially credible. (Tr. at 532.)

An MRI of the lumbar spine taken on December 4, 2007, showed "[s]car tissue causing moderate foraminal narrowing on the left at L4-L5" and "[m]ultifactorial significant foraminal narrowing on the left at L5-S1 and to a lesser degree on the right at L5-S1." (Tr. at 591.)

On June 11, 2008, Dr. Morris opined that Plaintiff's symptoms were "arising from a sacroiliac source" and recommended injectional therapies. (Tr. at 597.) Plaintiff underwent bilateral sacroiliac injections on June 27, 2008. (Tr. at 588.)

Plaintiff again participated in physical therapy in July 2008. (Tr. at 610-17.) It was noted that Plaintiff's muscle strength in her lower extremities was 5/5 in 7 areas and 4/5 in hip flexion. (Tr. at 610.) On July 28, 2008, Dr. Morris indicated that he was "fast running out of specific therapeutic options" and was "not certain where the source of her symptoms is originating . . . ." (Tr. at 596.) Two days later, a CT examination of Plaintiff's lumbar spine showed a "mild degree of central canal stenosis at L3-L4" and "[s]urgical changes" at L4-L5. (Tr. at 586-87.)

On August 6, 2008, Dr. Morris indicated that he was

8

> at something of a loss to describe the source of [Plaintiff's] continuing axial back pain. Her studies seem to suggest that she has done an excellent job of fusing the L4-L5 level and the other segments independent of this fusion do not appear to be structurally involved in relationship to an apparent mechanical process that could be serving as the basis of her symptoms.

(Tr. at 595.) Dr. Morris recommended further physical therapy. (*Id.*)

On September 3, 2008, Dr. Morris indicated that he was "at something at a loss to describe treatment options that might be further effective in providing a moderation of her present complaints." (Tr. at 594.)

On April 14, 2009, Lisa Kramp ("Kramp"), PT, DPT, CWCE, filled out a Medical Provider's Assessment of Patient's Ability to Do Physical Work-Related Activities. (Tr. at 618-21.) Kramp concluded that Plaintiff could sit for fifty minutes at a time and two to three hours in an eight-hour workday, stand for thirty minutes at a time and for one to two hours in an eight-hour workday, and walk for twenty minutes at a time and for thirty minutes in an eight-hour workday. (Tr. at 618.) Kramp also indicated that Plaintiff would need to shift positions every twenty to thirty minutes. (*Id.*) Kramp opined that Plaintiff could occasionally lift and carry twenty pounds. (*Id.*) Kramp found that Plaintiff could frequently reach above her shoulders and occasionally stoop, squat, kneel, climb ramps/stairs, crouch and crawl but should never climb ladders/ropes/scaffolds. (Tr. at 619.) Kramp also found that Plaintiff could frequently handle, finger, feel, and push/pull with her upper and lower extremities. (Tr. at 619-20.) Kramp also found that Plaintiff should never be exposed to unprotected heights, dangerous moving machinery or vibration. (Tr. at 620.) Kramp concluded that Plaintiff would not be able to return to her past work but that she "would qualify to return to work in the light/medium category . . . with restrictions of no frequent lifting, no lifting greater than thirty pounds on an occasional basis, and no overhead lifting of greater than twenty pounds on an occasional basis." (Tr. at 623.) Kramp also noted that Plaintiff should be allowed

9

"frequent postural changes." (*Id.*) Pursuant to Plaintiff's representative's request, Kramp clarified that it was her opinion that Plaintiff "could sit/stand/walk in an eight-hour workday as indicated in exhibit 15F." (Tr. at 698.)

On May 26, 2009, an MRI of the lumbar spine showed "[m]ild degenerative as well as postsurgical changes of the lower lumbar spine[,]" "[s]light inferolateral recess narrowing is present at the lower levels, greatest on the left at the L5-S1 level" and that the "overall appearance is generally stable relative to the prior examination." (Tr. at 653, 696.)

Plaintiff was treated by Michael Samalik, M.D. (Tr. at 654-64.) On June 3, 2009, Dr. Samalik noted that Plaintiff "states her lawyer gave me paper work to do for her back." (Tr. at 654.)

On August 31, 2009, Plaintiff sought treatment at the Munson Medical Center in Traverse City, Michigan. (Tr. at 671-73.) Anthony Hockin, M.A., and Vincent Conrellier, Ph.D., evaluated Plaintiff and found "[n]o significant psychopathology" and that Plaintiff's "depressive symptoms that appear to be reactive to her chronic pain condition and are likely to improve in response to a more effective pain management program." (Tr. at 672.) Therefore, it was concluded that Plaintiff would seek care on "an as-needed basis[.]" (*Id.*)

Plaintiff was also treated at the Munson Healthcare Pain Clinic in 2010. (Tr. at 704-15.) In August, September, October, and November of 2010, it was noted that Plaintiff's "pain problem is stable." (Tr. at 705, 708, 711, 714.) It was also consistently noted that Plaintiff was alert and oriented, and that Plaintiff had a "[f]airly normal gait and posture." (*Id.*)

Plaintiff indicated in her Daily Activity Report that on a typical day she watches television, cleans her house, visits friends or family, cooks dinner, and does dishes. (Tr. at 236.) Plaintiff indicated that she cooks for one to one and one-half hours at a time, cleans, does laundry, takes care of the dogs, is able to care for her own personal hygiene, but is not able to vacuum or do yard work

anymore. (Tr. at 237-39.) Plaintiff indicated that she goes outside every day, travels by walking and driving a car, shops for groceries for one hour at a time and is able to handle her own finances. (Tr. at t 239.) Plaintiff also stated that she enjoys doing puzzles, playing games with family and friends, and socializing with friends and family every day. (Tr. at 240.)

At the administrative hearing, Plaintiff testified that she had two prior back surgeries in May 2005 and July 2006. (Tr. at 38.) Plaintiff stated, I "[s]till have a lot of pain in my back and down my [left] leg. I'm on pain medications. I'm on anti-depressants. I have three kids, and I have a hard time, sometimes, just living life the way I have to." (Tr. at 38-39.) Plaintiff's children were 15, 14, and 9 years old at the time of the hearing. (Tr. at 42.) Plaintiff indicated that she was taking Simvastatin for high cholesterol, Methadone for pain, Flexeril as a muscle relaxer, and Zoloft (since two months prior to the hearing) for depression. (Tr. at 39-40.) When asked whether the Zoloft was helping, Plaintiff responded, "Yes." (Tr. at 40.) When asked whether the medications help with her pain, Plaintiff responded, Yes, they do." (Tr. at 41.) When asked what aggravates her pain, Plaintiff responded, "[s]tanding or sitting too long in one position." (Tr. at 42.) As to side effects, Plaintiff stated that she "get[s] sleepy sometimes" and that her memory and concentration are "off" or "not the same[.]" (Tr. at 40.)

Plaintiff stated that she takes one nap for three to four hours each day. (Tr. at 41.) Plaintiff indicated that she has a driver's license but drives only short distances. (*Id.*) Plaintiff also testified that she does "[v]ery little" around the house because she and her family live with her mom who helps by "cooking for my kids and doing my laundry and stuff." (Tr. at 42-43.) Plaintiff stated that she "hate[s] it" but that she does grocery shop once a week and that she does not use a motorized cart to do so. (Tr. at 43.) When asked how she keeps herself busy during the day, Plaintiff responded that she watches TV, plays on the computer, and plays with her two dogs. (*Id.*)

11

When asked by her attorney how long she could sit or stand at one time, Plaintiff responded, "Maybe five, 10 minutes" and "Maybe five minutes[.]" respectively. (Tr. at 44.) Plaintiff indicated that she can lift a gallon of milk, but "wouldn't go anymore than that." (Tr. at 44.)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider an individual with Plaintiff's background who

> can perform work at the sedentary level; however, she can never climb ladders, ropes, or scaffolds; and can never balance.
>
> She can occasionally stoop, crouch, kneel, or crawl. She requires the option to sit-stand at will. This person must avoid all exposure to work place hazards such as unprotected heights and moving machinery.
>
> She should avoid all vibration.

(Tr. at 47.) The VE responded that such a person could not perform Plaintiff's past relevant work but could perform the 3,500 final assembly and 3,500 inspector jobs available in the region. (Tr. at 47-48.) The ALJ clarified that even if the sit-stand option were changed from at will to every 30 minutes, the VE confirmed that the jobs listed would still be available. (Tr. at 51.)

**F.     Analysis and Conclusions**

**1.     Legal Standards**

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 21-25.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10, 1983 WL 31251, at *5.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.      Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 16.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ "made an erroneous credibility determination" (Doc. 16 at 8-11) and that the "ALJ erroneously found work at Step Five" because the ALJ's RFC contains no mental limitations. (*Id.* at 11-12.)

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility

assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645, at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to

14

establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." SSR 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

> (I)    [D]aily activities;
>
> (ii)   The location, duration, frequency, and intensity of . . . pain;
>
> (iii)  Precipitating and aggravating factors;
>
> (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)   Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; SSR 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); SSR 96-7p, at *5.

In the instant case, the ALJ thoroughly considered each of the above factors. (Tr. at 21-25.) I suggest that the ALJ's finding – that Plaintiff's allegations regarding the intensity, persistence, and limiting effects of her impairments are less than fully credible – is supported by substantial evidence. (Tr. at 24.) The only other person to have evaluated Plaintiff's credibility also found Plaintiff's alleged symptoms only partially credible. (Tr. at 532.)

Furthermore, Plaintiff's treating physician did not specifically assess credibility but expressed doubt as to the legitimacy of her reported symptoms. After Plaintiff's second surgery in 2006, Dr. Morris was puzzled as to the source of Plaintiff's continuing reported symptoms. Dr. Morris stated that the "MRI study of her lumbar spine looks absolutely unremarkable" and that

15

there "does not appear to be any evidence of nerve root impingement serving as the basis of her symptoms." (Tr. at 329.) Dr. Morris was "wondering whether her present symptoms are a product of mechanical etiologies arising" from the post-surgical use of a brace. (*Id.*) After time passed and the symptoms could no longer be tied to the temporary use of a brace, Dr. Morris opined that perhaps Plaintiff's symptoms were "arising from a sacroiliac source" and recommended injectional therapies, which Plaintiff was given. (Tr. at 588, 597.) By July 28, 2008, Dr. Morris indicated that he was "fast running out of specific therapeutic options" and was "not certain where the source of her symptoms is originating . . . ." (Tr. at 596.) On August 6, 2008, Dr. Morris indicated that he was "at something of a loss to describe the source of her continuing axial back pain. Her studies seem to suggest that she has done an excellent job of fusing the L4-L5 level and the other segments independent of this fusion do not appear to be structurally involved in relationship to an apparent mechanical process that could be serving as the basis of her symptoms." (Tr. at 595.)

In addition, despite reported symptoms, Plaintiff continued to have 5/5 strength and the ability to "straight leg raise bilaterally" and "toe-stand and toe-walk." (Tr. at 518, 610.) In August, September, October, and November of 2010, it was noted that Plaintiff's "pain problem [was] stable." (Tr. at 705, 708, 711, 714.) It was also consistently noted that Plaintiff was alert and oriented and that she had "[f]airly normal gait and posture." (*Id.*)

Medical evidence failed to show a source for Plaintiff's alleged disabling pain. An MRI of Plaintiff's pelvis taken on January 9, 2007, showed "[n]o abnormalities identified at either hip." (Tr. at 328, 394.) An x-ray of the lumbosacral spine in 2007 showed "[n]o acute abnormalities[.]" (Tr. at 520.) A CT examination of Plaintiff's lumbar spine taken on July 30, 2008, showed a "mild degree of central canal stenosis at L3-L4" and "[s]urgical changes" at L4-L5. (Tr. at 586-87.) On May 26, 2009, an MRI of the lumbar spine showed "[m]ild degenerative as well as postsurgical

16

changes of the lower lumbar spine[,]" "[s]light inferolateral recess narrowing is present at the lower levels, greatest on the left at the L5-S1 level" and that the "overall appearance is generally stable relative to the prior examination." (Tr. at 653, 696.)

As to mental impairments, Plaintiff's evaluation uncovered "[n]o significant psychopathology" and found that Plaintiff's "depressive symptoms [] appear[ed] to be reactive to her chronic pain condition and are likely to improve in response to a more effective pain management program." (Tr. at 672.) Therefore, it was concluded that Plaintiff would seek care on "an as-needed basis[.]" (*Id.*) There was no on-going treatment suggested. I therefore suggest that the ALJ properly found that any psychological symptoms did not routinely interfere with her ability to perform daily tasks. (Tr. at 24.)

Finally, the RFC Assessment supported the ALJ's findings and also concluded that Plaintiff's subjective complaints were only partially credible. (Tr. at 532.) The only other person to have assessed Plaintiff's ability to work, Ms. Kramp, also opined that Plaintiff "would qualify to return to work in the light/medium category . . . with restrictions of no frequent lifting, no lifting greater than 30 pounds on an occasional basis, and no overhead lifting of greater than 20 pounds on an occasional basis." (Tr. at 623.)

I therefore suggest that the ALJ's finding that Plaintiff was not fully credible is supported by substantial evidence and should not be disturbed.

I further suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessments (Tr. at 525-32, 618-21) and was in harmony with the objective record medical evidence and Plaintiff's own statements that, despite the pain, she cleans her house, visits friends or family, cooks meals for one to one and one-half hours at a time, washes dishes, does laundry, takes care of the dogs, cares for her own personal hygiene, goes outside every day, travels

by walking and driving a car, shops for groceries for one hour at a time, handles her own finances, does puzzles, plays games with family and friends, and socializes with friends and family every day. (Tr. at 236-40.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with

the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                                                  s/ *Charles E Binder*
                                                     CHARLES E. BINDER
Dated: August 27, 2013                           United States Magistrate Judge

**CERTIFICATION**

      I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  August 27, 2013                    By    s/Patricia T. Morris
                                                                 Law Clerk to Magistrate Judge Binder